## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**JUDITH GAYLE HOLMBECK; KAREN TAYLOR;**        **PLAINTIFFS**
**RHONDA KING; ANNETTE STETTNISH CORNISH;**
**ROBIN CARTER; and JANE RUSSELL**

**v.**        **Case No. 2:19-CV-00154-LPR**

**DAVID P. SOLOMON**        **DEFENDANT**

## ORDER

This case is about the administration of a trust.  Plaintiffs are remainder beneficiaries of the James E. Walden Trust.  They say that, while serving as Trustee, Defendant David P. Solomon abused his powers for personal profit.  Plaintiffs brought this suit (on behalf of the Trust) to disgorge Defendant's allegedly ill-gotten gains.  Pending before the Court is Defendant's Motion to Dismiss.  For the reasons given below, Defendant's Motion is GRANTED.[1]

## BACKGROUND[2]

The testamentary trust at the center of this case was established by the Last Will and Testament of James E. Walden ("the Will").  The Trust consisted (and currently consists) almost entirely of (1) all of the ownership shares in Helena Bridge Terminal, Inc. and (2) half of the

---

[1] Def.'s Mot. to Dismiss (Doc. 110).  Plaintiff Jane Russell also filed a Motion to Dismiss, adopting Defendant's arguments.  Pl.'s Mot. to Dismiss (Doc. 112).  The Court GRANTS Ms. Russell's Motion to Dismiss for the same reasons it grants Defendant's Motion to Dismiss.

[2] The facts in this Background Section are from the allegations (taken as true) in the Second Amended Complaint or from documents embraced by the Second Amended Complaint.  *See Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014).  A document is embraced by a complaint when it is (among other things) incorporated by reference, integral to the claim, attached to the complaint, or referenced by inference.  *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); *Dittmer Props., L.P. v. Fed. Deposit Ins. Corp.*, 708 F.3d 1011, 1021 (8th Cir. 2013).  In the event there are any clear inconsistencies between an allegation in the Second Amended Complaint and a document embraced by the Second Amended Complaint, the document controls.  *See Zean*, 858 F.3d at 526–27 (stating that a court may consider "documents not attached to the complaint" even if those documents "refute . . . a claim that defendant breached a statutory or common law duty").

ownership shares in Helena Marine Services, Inc.[3]  During his life, Mr. Walden created and ran these two companies.[4]

Both companies operated on land leased from Solomon Farms, LLC.[5]  Solomon Farms was (at least partially) owned by Defendant's identically named father, David P. Solomon ("Father-Solomon").[6]  Father-Solomon was more than just a landlord; he was also Mr. Walden's personal attorney and close confidante.[7]  As Mr. Walden's attorney, Father-Solomon worked with Mr. Walden to create the Will.[8]

The Will dictates who is to benefit from the Trust's property and income.  The Will states that "all the net income from [the] Trust" shall be paid "in convenient instalments" to Jane Russell for the rest of her life.[9]  In the parlance of trust law, that means Ms. Russell is an "income beneficiary."[10]  Ms. Russell was a longtime employee of Mr. Walden's.[11]  Eventually, she became the President of both Helena Bridge and Helena Marine.  She remained in these roles during the events giving rise to this litigation.[12]

---

[3] *See* Second Am. Compl. (Doc. 109) ¶ 22.

[4] *Id.* ¶ 13.

[5] *Id.* ¶¶ 29, 32.

[6] *See id.* ¶ 25.

[7] *See id.* ¶ 14.

[8] *Id.* ¶ 15.

[9] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item II, ¶¶ 1–2; *see also* Second Am. Compl. (Doc. 109) ¶ 19.

[10] Second Am. Compl. (Doc. 109) ¶ 21 (emphasis omitted).

[11] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item II, ¶ 1; *see also* Second Am. Compl. (Doc. 109) ¶ 19.

[12] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) at 5; Ex. 6 (Helena Bridge Asset Sale Agreement) to Second Am. Compl. (Doc. 109) at 12.  As of February 1, 2021, Ms. Russell was still President of Helena Marine.  *See* Ex. 11 (2021 Helena Marine Lease) to Second Am. Compl. (Doc. 109) at 1, 4.  It is unclear if she still holds this position.  It is also unclear whether she continued to serve as President of Helena Bridge after the below-discussed asset sale that occurred in 2019.

The Will goes on to provide that, after Ms. Russell's death, "the Trustee shall pay to and distribute to [Mr. Walden's] [d]aughters, Judith Gale Holmbeck and June Clair Wells[,] all of the assets from [the] Trust in equal shares, and [the] Trust shall terminate."[13]  And if either of Mr. Walden's daughters passed away before Ms. Russell, the deceased daughter's shares would be "distributed to . . . her descendants . . . ."[14]  Ms. Wells passed away on May 20, 2021.[15]  Plaintiffs Karen Taylor, Rhonda King, Annette Stettnish Cornish, and Robin Carter are her children.[16]  They, along with Ms. Holmbeck, are considered "remainder beneficiaries."[17]

The Will outlines the Trustee's powers and duties.  Under the terms of the Will, the Trustee has broad powers over Trust property.  Of particular relevance to the case at bar are the provisions relating to the Trust's ownership interests in Helena Bridge and Helena Marine.  For example, the Trustee has the power to:

- "[S]ell or dispose of . . . any property, real or personal, constituting a part of the Trust Estate . . . at such times and upon such terms and conditions as the Trustee may deem best . . . ."[18]

- "[V]ote shares of stock owned by the Trust Estate . . . [and] exercise all the rights, powers and privileges of an owner in respect to any securities constituting a part of the Trust Estate."[19]

- "[E]nter for any purpose into a lease as lessor or lessee with or without option to purchase or renew for a term . . . ."[20]

- "[C]ontinue and operate any business owned by [Mr. Walden] at [his] death and to do any and all things deemed needful or appropriate by the Trustee, including the power to . . .

---

[13] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item II, ¶ 2; *see also* Second Am. Compl. (Doc. 109) ¶ 20.

[14] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item II, ¶ 2; *see also* Second Am. Compl. (Doc. 109) ¶ 20.

[15] Second Am. Compl. (Doc. 109) ¶¶ 11.

[16] Pls.' Mot. to Substitute Parties (Doc. 79-1) ¶ 3.

[17] Second Am. Compl. (Doc. 109) ¶ 21 (emphasis omitted).

[18] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item III, ¶ 3.

[19] *Id.*, Item III, ¶ 7.

[20] *Id.*, Item III, ¶ 10.

close out, liquidate or sell the business at such time and upon such terms as the Trustee shall deem best."[21]

The Will named Father-Solomon as the initial Trustee.[22]  So Father-Solomon became (in essence) both the landlord and the tenant with respect to any leases between Solomon Farms and Helena Bridge or Helena Marine.  That could have posed quite a problem because Arkansas law generally prohibits a trustee from having such a conflict of interest.[23]  Foreseeing the potential issue, however, Mr. Walden and Father-Solomon included a provision in the Will that allowed Father-Solomon to serve as Trustee despite this conflict of interest.  The Will gives the Trustee the following power:

> In buying and selling assets, in lending and borrowing money, and in all other transactions, irrespective of the occupancy by the same person of dual position, to deal with the Trustee in the Trustee's separate, or any fiduciary capacity.[24]

Mr. Walden died in 1997.[25]  Father-Solomon served as Trustee from 1997 until he resigned in August of 2015.[26]  Under the terms of the Will, Southern Bancorp Bank was next in line to serve as Trustee.[27]  But Southern Bancorp Bank "sign[ed] a declination to serve as" Trustee.[28]  So Father-Solomon asked the state probate court to fill the vacant trusteeship with his (identically named) son, David P. Solomon.[29]  Ms. Russell, as the income beneficiary, submitted to the state probate

---

[21] *Id.*, Item III, ¶ 13.

[22] *Id.*, Item IV; *see also* Second Am. Compl. (Doc. 109) ¶ 23.

[23] *E.g.*, *White v. Ward*, 26 Ark. 445, 446–47 (1871).

[24] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item III, ¶ 16; *see also* Second Am. Compl. (Doc. 109) ¶ 26.

[25] Second Am. Compl. (Doc. 109) ¶ 17.

[26] *Id.* ¶¶ 17, 37–42.

[27] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item IV (naming First National Bank of Phillips County as successor to Father-Solomon); Second Am. Compl. (Doc. 109) ¶¶ 24, 37 (alleging that Southern Bancorp Bank is successor in interest to First National Bank of Phillips County).

[28] Second Am. Compl. (Doc. 109) ¶ 37; *see also* Ex. 3 (Declination of Trust) to Second Am. Compl. (Doc. 109). Plaintiffs allege that Southern Bancorp Bank signed this declination at the request of someone, but the Second Amended Complaint does not explicitly say who made the request.  Second Am. Compl. (Doc. 109) ¶ 37.

[29] *Id.* ¶ 38.

court a Consent of Beneficiary notice, indicating her approval of the proposed appointment.[30]  The

state probate court appointed David P. Solomon (the son) as Trustee on August 25, 2015.[31]  He

served as Trustee until he resigned on March 9, 2020.[32]  Throughout his service as Trustee, he was

also a managing member and part owner of Solomon Farms.[33]  And, as explained above, he is the

Defendant in this case.

## I.    Defendant's Alleged Misconduct

Father-Solomon's long tenure as Trustee was apparently uncontroversial.  In contrast,

Defendant's short time in charge led to claims of significant wrongdoing.  The claims center

around Defendant's alleged actions (or omissions) with regard to (1) Solomon Farms's leases with

Helena Marine and Helena Bridge, and (2) the sale of Helena Bridge's assets.[34]

### A.    Helena Bridge and Helena Marine Leases

Helena Marine first became a tenant of Solomon Farms in 1961.[35]  Helena Bridge first

became a tenant of Solomon Farms in 1988.[36]  On September 15, 2014 (slightly less than one year

before Defendant became Trustee), both companies jointly entered into a new lease with Solomon

---

[30] *Id.* ¶ 39; *see also* Ex. 4 (Consent of Beneficiary) to Second Am. Compl. (Doc. 109).

[31] Second Am. Compl. (Doc. 109) ¶¶ 12, 42.  While Plaintiffs are clearly upset about the appointment, they do not presently challenge the appointment in this Court.  In their original Complaint, Plaintiffs did ask this Court to remove Defendant from the trusteeship.  *See* Compl. (Doc. 1) ¶¶ 44–48.  That request became moot, however, when Defendant resigned as Trustee.  *See* Pls.' Mot. to Appoint Successor Trustee (Doc. 8) ¶ 2.  Plaintiffs then asked this Court to appoint a successor Trustee.  *Id.* ¶ 3.  That request likewise became moot after the state probate court appointed Relyance Bank as Trustee.  *See* Order (Doc. 56); Mar. 4, 2021 Hr'g Tr. (Doc. 64) at 4:22–5:22.

[32] Second Am. Compl. (Doc. 109) ¶¶ 12, 78.

[33] *Id.* ¶¶ 28, 43.

[34] *See id.* ¶ 103.

[35] *Id.* ¶ 32.

[36] *Id.* ¶ 29.

Farms.[37]  The lease was for "an initial term of three years" and expired on September 14, 2017.[38]

Plaintiffs allege that "the annual rent payment . . . was $72,000."[39]  Ms. Russell signed the lease

on behalf of both companies as President of Helena Bridge and President of Helena Marine.[40]

Under the 2014 lease, Helena Bridge and Helena Marine had the "option to extend . . .

upon the same terms and conditions except as to the [rent price], for an additional period of three

years . . . ."[41]  The 2014 lease required that Helena Bridge and Helena Marine exercise the right to

renew in writing at least sixty days before the lease expired.[42]  The rent price for the extended term

was to be negotiated or, if negotiations were unsuccessful, arbitrated.[43]

Plaintiffs contend that the 2014 lease and the accompanying renewal rights were "valuable

and distinct asset[s] of" Helena Bridge and Helena Marine.[44]  Plaintiffs further state that "Helena

Bridge and Helena Marine relied upon their rights under [the 2014 lease] to, among other things,

make certain improvements to" the leased property.[45]  The specific "improvements" to which

Plaintiffs refer are a warehouse built by Helena Bridge and an office building constructed by

Helena Marine.[46]  Helena Bridge built the warehouse "at some point prior to the beginning of the

---

[37] Second Am. Compl. (Doc. 109) ¶¶ 30, 33; *see also* Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) at 1 (showing that Helena Bridge and Helena Marine jointly entered into one lease with Solomon Farms). The Court may consider the 2014 lease because it is a document embraced by the pleadings.  *See supra* note 2.

[38] Second Am. Compl. (Doc. 109) ¶¶ 30, 33; Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 1.

[39] Second Am. Compl. (Doc. 109) ¶¶ 30, 33.

[40] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) at 5.

[41] *Id.* ¶ 8.

[42] *Id.*

[43] *Id.*

[44] Second Am. Compl. (Doc. 109) ¶¶ 31, 34.

[45] *Id.* ¶ 36.

[46] *Id.* ¶¶ 44–45.

Defendant's tenure as" Trustee.[47]   Helena Bridge spent "approximately $140,000 of company funds" to build the warehouse.[48]   As for Helena Marine's office building, it was constructed "at some point after" Defendant took over as Trustee.[49]   Helena Marine spent "approximately $650,000 of company funds" on the office building.[50]   Helena Marine used (and uses) the office building "in its day-to-day operations . . . ."[51]

Neither Helena Bridge nor Helena Marine exercised the right to renew the 2014 lease. Plaintiffs accuse Defendant of orchestrating the non-renewal.   Specifically, Plaintiffs allege that Defendant (wearing his Trustee hat) "intentionally fail[ed] to renew (or attempt to renew)" the 2014 lease.[52]   Plaintiffs further allege that, on September 14, 2017—the day that the 2014 lease expired on its own terms—Defendant (wearing his Landlord hat) "intentionally caused [the 2014 lease] then in force to be terminated by . . . asserting that [the] lease had not been 'renewed' and by treating it as fully expired with no possibility of renewal."[53]   According to Plaintiffs, Defendant (wearing his Landlord hat) "then converted the leasehold rights of [Helena Bridge and Helena Marine] . . . into a lesser estate, namely a month-to-month tenancy . . . ."[54]

---

[47] Id. ¶ 44.

[48] Id.

[49] Id. ¶ 45.

[50] Id.

[51] Id. ¶ 54.  Helena Marine also uses the building "for the limited purpose of receiving lease payments made by a third party renting office space in the" office building.  Id.  Under the current lease, Helena Marine is prohibited from "sublet[ting] or assign[ing] any portion of the [leased] premises," with the sole exception being that Helena Marine "shall have the right to sub-lease office space to Poinsett Rice and Grain, Inc. . . . ."  Ex. 11 (2021 Helena Marine Lease) to Second Am. Compl. (Doc. 109) ¶ 3.  As explained later in this Order, Poinsett Rice and Grain, Inc. was the purchaser in the Helena Bridge asset sale and replaced Helena Bridge as a tenant on the leased land after the asset sale.  *See infra* notes 61–78 and accompanying text.

[52] Second Am. Compl. (Doc. 109) ¶ 103(b).

[53] Id. ¶¶ 48, 50.

[54] Id.

Plaintiffs are saying that Defendant (wearing both hats) purposefully caused Helena Bridge and Helena Marine to forego renewal of the 2014 lease because he personally benefited from the lease's termination.[55]  Specifically, Plaintiffs say that Defendant did this in order to claim legal ownership (via Solomon Farms) of the warehouse and office building constructed by Helena Bridge and Helena Marine, respectively.[56]  The 2014 lease stated that, upon expiration, Helena Bridge and Helena Marine would "promptly and peaceably deliver to [Solomon Farms] the [leased] property and premises together with any addition or improvements thereto . . . ."[57]

After the 2014 lease expired, Helena Bridge and Helena Marine remained on the leased property as month-to-month tenants.  Helena Bridge's month-to-month tenancy ended in June of 2019, when it ceased operations as a business entity after the asset sale that is discussed below.[58]  Helena Marine's month-to-month tenancy continued until February 1, 2021, when Defendant (no longer serving as Trustee) "caused a replacement lease . . . to be executed between Solomon Farms as lessor and [Helena Marine] as lessee . . . ."[59]  That new lease expires on December 31, 2025.[60]

---

[55] *Id.* ¶¶ 49, 51.

[56] *Id.* ¶¶ 53–54.  It is worthwhile to clarify that Plaintiffs' allegations surrounding the non-renewal of the 2014 lease and their allegations surrounding the 2019 Helena Bridge asset sale support distinct theories of liability.  That is, Plaintiffs do not allege that the non-renewal of the 2014 lease was the first step in some complex master plan that culminated in the 2019 Helena Bridge asset sale.  The non-renewal of the 2014 lease occurred in 2017, and Plaintiffs allege that the asset-sale negotiations began only "some months" before June of 2019.  *Id.* ¶ 61.

[57] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 4; Second Am. Compl. (Doc. 109) ¶¶ 53–54.

[58] Second Am. Compl. (Doc. 109) ¶¶ 61, 65(b)–(c).

[59] *Id.* ¶ 80; *see also* Ex. 11 (2021 Helena Marine Lease) to Second Am. Compl. (Doc. 109).

[60] Ex. 11 (2021 Helena Marine Lease) to Second Am. Compl. (Doc. 109) ¶ 1.  The 2021 lease could potentially expire sooner.  There is a provision that says "in the event the current President and CEO of Helena Marine Service, Inc., shall no longer hold those positions, [Solomon Farms] shall have the immediate right to terminate this agreement upon thirty (30) days' notice to [Helena Marine]."  *Id.* ¶ 5.  The lease was signed by Ms. Russell as President and CEO of Helena Marine.  *Id.* at 4.  There is no provision giving Helena Marine a right to renew the lease.  Second Am. Compl. (Doc. 109) ¶ 81(b).

### B.      Helena Bridge Asset Sale

Helena Bridge "had been in existence and operating on the [leased property] since at least 1988."[61]  By 2018, the company "was an operating business with approximately $980,000 of top-line revenue . . . ."[62]  But, in June of 2019, Helena Bridge "ceased operations as [a] business entity" after it sold "a portion of [its] assets" to Poinsett Rice and Grain, Inc.[63]  Helena Bridge was paid a total of $1,900,000 for its assets.[64]  Prior to any cash changing hands, Poinsett Rice and Grain spent $180,426.90 of the total purchase price to pay off two of Helena Bridge's outstanding loans.[65]  The remaining $1,719,573.10 went to Helena Bridge.[66]  The company used most of the proceeds to pay off various debts—including $31,000 for "[b]ack rent" to Solomon Farms and $570,139 for a "[l]oan payment" to Helena Marine.[67]

The 2019 asset sale included a sizeable quantity of Helena Bridge's assets.[68]  But Plaintiffs' allegations focus on what they say was not folded into the sale price: the warehouse, Helena Bridge's "goodwill," and the company's "leasehold rights."[69]  Plaintiffs allege that these "valuable asset[s]" were "transferred away from [Helena Bridge], but without any consideration being obtained for them by [Helena Bridge] . . . ."[70]  According to Plaintiffs, this lack of additional

---

[61] Second Am. Compl. (Doc. 109) ¶ 58.

[62] Id.

[63] Id. ¶¶ 61, 65(c).

[64] Ex. 6 (Helena Bridge Asset Sale Agreement) to Second Am. Compl. (Doc. 109) at 2.

[65] Ex. 7 (Helena Bridge Asset Sale Settlement Statement) to Second Am. Compl. (Doc. 109) at 1.

[66] Id.

[67] Ex. 8 (Helena Bridge Asset Sale Post Closing Summary) to Second Am. Compl. (Doc. 109) at 1.

[68] See Ex. 6 (Helena Bridge Asset Sale Agreement) to Second Am. Compl. (Doc. 109) at 13–15.

[69] Second Am. Compl. (Doc. 109) ¶¶ 59–61.

[70] Id. ¶¶ 59, 65(a)–(b).

consideration (and the fact that Helena Bridge ceased operations as a result of the sale) shows that the 2019 asset sale "was not in the best interests of the Trust."[71]

Ms. Russell (in her capacity as President of Helena Bridge) was the person that signed all of the documents that memorialized the sale and made it effective.[72]   But Plaintiffs allege that Defendant was really calling the shots.[73]   According to Plaintiffs, "Defendant acted through agents, such as [Ms.] Russell . . . but he himself was personally aware beforehand of the [asset sale], its terms, its effects, and the [asset sale] was done with his approval."[74]   And Defendant allegedly "knew that the [asset sale] was not in the best interests of the Trust . . . ."[75]   He allegedly initiated the asset sale despite this knowledge because it personally benefited him "as a managing member and part owner of Solomon Farms . . . ."[76]   That is, Defendant personally benefited "by removing [Helena Bridge] as a going concern from the valuable [leased property] owned by Solomon Farms and installing Poinsett [Rice and Grain] as the new tenant."[77]   Poinsett Rice and Grain allegedly entered into a decades-long lease with Solomon Farms at an annual rent of "approximately $100,000, a 31% increase from the annual rent paid under the" 2014 lease.[78]

---

[71] *Id.* ¶ 64.

[72] Ex. 6 (Helena Bridge Asset Sale Agreement) to Second Am. Compl. (Doc. 109) at 12; Ex. 7 (Helena Bridge Asset Sale Settlement Statement) to Second Am. Compl. (Doc. 109) at 2.

[73] Second Am. Compl. (Doc. 109) ¶¶ 61–62.

[74] *Id.* ¶ 62.

[75] *Id.* ¶ 66.

[76] *Id.* ¶ 63.

[77] *Id.*

[78] *Id.* ¶ 65(d).

## II.    Subsequent Events and Litigation

Shortly after the Helena Bridge asset sale, in October of 2019, "Plaintiffs engaged in due diligence on the status of the Trust by conducting a 'check-in' . . . ."[79]  During this "check-in," Plaintiffs first learned about Defendant's appointment as Trustee and the asset sale.[80]  Plaintiffs also discovered that Defendant had solicited appraisals for Helena Marine and was "engaging in attempts to also sell off" Helena Marine.[81]

Afraid that Helena Marine would meet a fate similar to that of Helena Bridge, "Plaintiffs engaged in dialogue with the Defendant and his agents."[82]  Defendant responded to Plaintiffs on December 3, 2019, with (what Plaintiffs call) a "retaliatory letter" in which he threatened to terminate Helena Marine's month-to-month tenancy if Plaintiffs took any legal action against him:

> In the spirit of being transparent and actually working towards a resolution, I have been instructed by the owners of Solomon Farms, LLC, which consists of several family members, to give notice to all persons and entities involved that should Solomon Farms, LLC or the family members be made a party to any litigation, the favorable month to month tenancy enjoyed by Helena Marine Service, Inc., will be immediately terminated and Helena Marine Service, Inc., will be allowed thirty (30) days to vacate the premises.
>
> With that, I propose we think in terms of actual third party value for Helena Marine Service, Inc.  By that, I mean that an asset's true value is what a legitimate buyer is willing to pay.  Of course, appraisals can be a useful valuation tool but often just a theoretical number.   Perhaps we, working together, solicit third party bids for Helena Marine Service, Inc.  After we have those independent numbers, we make a decision whether one side buys the other or the entire entity is sold.[83]

As a result of this letter, "Plaintiffs became convinced that the Defendant did not view his role as [Trustee] as requiring him to act as a fiduciary with regard to the Trust's assets, especially if doing

---

[79] *Id.* ¶ 71.

[80] *Id.*

[81] *Id.* ¶ 72.

[82] *Id.* ¶ 73.

[83] Ex. 9 (Retaliatory Letter) to Second Am. Compl. (Doc. 109) at 1–2; Second Am. Compl. (Doc. 109) ¶ 74.

so would require him to do anything that negatively impacted his own personal interests as an owner of [Solomon Farms]."[84]   Plaintiffs felt it necessary to bring suit "to preserve the remaining assets of the Trust, restore its value that had been removed by the Defendant, and otherwise seek the protection of the Court."[85]

Plaintiffs filed the case at bar on December 12, 2019.[86]   Plaintiffs originally sued Defendant, Solomon Farms, and Helena Marine.[87]   Plaintiffs sought "an order removing the Defendant as trustee and an order appointing a successor trustee."[88]   Plaintiffs also requested that the Court appoint a receiver for Helena Marine in order "to preserve Helena Marine's assets and to prevent an impairment of its assets and value."[89]   Plaintiffs considered this a necessary precaution because "Helena Marine [was] effectively controlled by Defendant Solomon as Trustee."[90]

Defendant resigned the trusteeship on March 9, 2020, the day after he was served with the Complaint.[91]   On March 23, 2020, Helena Marine moved to dismiss the Complaint.[92]   On March 26, 2020, Plaintiffs asked the Court to appoint a successor Trustee.[93]   On March 30, 2020, Defendant and Solomon Farms moved to dismiss or abstain.[94]

---

[84] Second Am. Compl. (Doc. 109) ¶ 75.

[85] *Id.* ¶ 76.

[86] Compl. (Doc. 1); Second Am. Compl. (Doc. 109) ¶ 77.

[87] Compl. (Doc. 1).

[88] Second Am. Compl. (Doc. 109) ¶ 77.

[89] Compl. (Doc. 1) ¶ 64.

[90] *Id.* ¶ 63.

[91] Second Am. Compl. (Doc. 109) ¶ 78; Pls.' Mot. to Appoint Successor Trustee (Doc. 8) ¶ 2.

[92] Def. Helena Marine's Mot. to Dismiss (Doc. 4).

[93] Pls.' Mot. to Appoint Successor Trustee (Doc. 8).

[94] Defs. David Solomon, Jr. and Solomon Farms's Mot. to Dismiss (Doc. 12).

On April 10, 2020 (with the three just-discussed motions still pending), Plaintiffs filed their First Amended Complaint.[95]   Plaintiffs kept the same defendants and added Ms. Russell—the income beneficiary of the Trust and President of both Helena Bridge and Helena Marine—as a defendant.[96]   The First Amended Complaint mooted the requests for dismissal and abstention.[97] But Defendant, Helena Marine, Solomon Farms, and Ms. Russell quickly renewed (and added onto) such arguments, again moving to dismiss, to stay, or to hold in abeyance.[98]

On May 6, 2020, before the Court had ruled on any of the then-pending motions, the parties filed a Joint Motion for Referral to Settlement Conference.[99]   The Court "stay[ed] all pending motions," but refused to "refer this case for settlement until it is satisfied that it has jurisdiction."[100] (One argument in the motions to dismiss was that the probate exception to diversity jurisdiction applied to this case.)   The Court allowed briefing on the jurisdictional issue.[101]   After receiving this briefing, and while evaluating its jurisdiction, the Court received multiple notices from the parties.   On August 14, 2020, Defendant and Solomon Farms notified the Court that the Circuit Court of Phillips County, Arkansas, Probate Division, had appointed Relyance Bank as successor Trustee.[102]   On August 25, 2020, Plaintiffs filed a Notice, along with a letter from Relyance Bank,

---

[95] First Am. Compl. (Doc. 25).

[96] *Id.*

[97] Orders (Docs. 27 & 28).

[98] Def. Jane Russell's Mot. to Dismiss (Doc. 29); Def. Helena Marine's Mot. to Dismiss (Doc. 31); Defs. David Solomon, Jr. and Solomon Farms's Mot. to Dismiss or Abstain (Doc. 33); Defs. David Solomon, Jr. and Solomon Farms's Mot. to Hold in Abeyance (Doc. 38).

[99] Joint Mot. for Referral to Settlement Conference (Doc. 40).

[100] Order (Doc. 41).

[101] Order (Doc. 43).

[102] Notice (Doc. 47); *see also* Second Am. Compl. (Doc. 109) ¶ 78.

stating that Relyance Bank "consents to the Plaintiffs . . . pursuing this action on behalf of the Trust."[103]

On December 15, 2020, the Court requested that the parties appear for a hearing.[104] That hearing took place on March 4, 2021.[105] The hearing had the following outcomes: (1) all motions related to the appointment of a successor Trustee were denied as moot, given that a new Trustee (Relyance Bank) had since been appointed;[106] (2) Helena Marine's Motion to Dismiss was denied as moot because Plaintiffs had agreed to voluntarily dismiss Helena Marine from the case;[107] (3) Ms. Russell was realigned as a plaintiff instead of a defendant because her "interest in this case . . . . is as a trust beneficiary";[108] and (4) the Court determined it had jurisdiction over most of Plaintiffs' claims.[109] The only remaining issues were Defendant's arguments that Plaintiffs had failed to state a claim upon which relief could be granted.[110] And the Court declined to rule on those arguments until the parties engaged in their previously requested settlement conference.[111]

The parties were unable to settle the case.[112] On May 12, 2021, the Court ordered additional briefing on Defendant's Motion to Dismiss.[113] Before any such briefing was filed, Ms.

---

[103] Notice (Doc. 50) ¶ 3; *see also* Second Am. Compl. (Doc. 109) ¶ 79.

[104] Order (Doc. 51).

[105] Clerk's Mins. (Doc. 55).

[106] Orders (Docs. 56 & 57).

[107] Order (Doc. 58); Notice of Voluntary Dismissal (Doc. 37); *see also* Mar. 4, 2021 Hr'g Tr. (Doc. 64) at 6:13–7:1.

[108] Br. in Supp. of Def. Jane Russell's Mot. to Dismiss (Doc. 30) at 2; *see also* Order (Doc. 59); Mar. 4, 2021 Hr'g Tr. (Doc. 64) at 7:8–8:18.

[109] Mar. 4, 2021 Hr'g Tr. (Doc. 64) at 74:11–76:17; *see also* Order (Doc. 67) (denying all of Mr. Solomon's jurisdictional arguments except his argument that the probate exception precluded jurisdiction of Plaintiffs' claim "for accounting and inventory").

[110] During the hearing, Plaintiffs expressed their intention to voluntarily dismiss Solomon Farms as a defendant. Mar. 4, 2021 Hr'g Tr. (Doc. 64) at 10:22–11:4. In the Second Amended Complaint, Solomon Farms is not a defendant.

[111] Order (Doc. 67) at 25–26.

[112] Clerk's Mins. (Doc. 69).

[113] Am. Order (Doc. 71).

Holmbeck notified the Court that Ms. Wells (a plaintiff at that time) passed away.[114]  In addition to filing the motion-to-dismiss briefs, both sides filed motions and briefs arguing over the proper replacement plaintiff(s) for Ms. Wells.  Plaintiff Holmbeck argued that, pursuant to the terms of the Will and Trust, Ms. Wells's children should replace her.[115]  Defendant argued that Relyance Bank, as Trustee, was the proper replacement.[116]  The Court eventually granted Ms. Holmbeck's substitution motion and denied Defendant's contrary motion.[117]

The Court held another hearing on March 18, 2022.[118]  Defendant's motion-to-dismiss arguments were the primary focus of that hearing.  Most important, for present purposes, was whether the Amended Complaint sufficiently alleged (1) harm to the Trust, and (2) that Defendant's actions or omissions violated applicable legal duties.  The hearing unmasked multiple deficiencies on these points.  The Court noted that it was "very hard . . . to tell what" Plaintiffs were "trying to claim in" the Amended Complaint.[119]  The Court further explained that Plaintiffs "need[ed] a whole lot more than what [they had], which . . . [were] just conclusory allegations."[120]

The Court allowed Plaintiffs an opportunity to amend the Amended Complaint.[121]  Plaintiffs filed their Second Amended Complaint on April 1, 2022.[122]  Defendant filed the pending

---

[114] Suggestion of Death (Doc. 72).

[115] Pl. Holmbeck's Mot. to Substitute Party (Doc. 79-1).

[116] Def.'s Mot. to Substitute Party (Doc. 86).

[117] Orders (Docs. 104 & 106).

[118] Clerk's Mins. (Doc. 103).

[119] Mar. 18, 2022 Hr'g Tr., Vol. II (Doc. 108) at 30:16–24.

[120] *Id.* at 31:25–32:1.

[121] *Id.* at 33:6–7.

[122] Second Am. Compl. (Doc. 109).

Motion to Dismiss two weeks later.[123]  Briefing has concluded, and the Court is ready to resolve the Motion.

## DISCUSSION

Plaintiffs bring two claims against Defendant.  Count One seeks "damages for breach of trust."[124]  Count Two alleges that Defendant violated Arkansas law by "profit[ing] from administration of trust."[125]  Neither claim survives Defendant's Motion to Dismiss.

Defendant's primary argument is that the Second Amended Complaint fails to state a claim upon which relief can be granted and should therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6).[126]  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[127] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[128]  "Factual allegations are taken to be true at the motion-to-dismiss stage because the plaintiff has not had a full opportunity to conduct discovery and thereby uncover facts that support his or her claim."[129]

---

[123] Def.'s Mot. to Dismiss (Doc. 110).  Plaintiff Jane Russell filed her own Motion to Dismiss as well.  *See* Joint Mot. to Dismiss (Doc. 112).  Ms. Russell "join[ed] in the motion of David P. Solomon to dismiss the Second Amended Complaint and adopt[ed] as her brief, his brief in support . . . ."  *Id.* at 1.

[124] Second Am. Compl. (Doc. 109) at 17 (capitalization and emphasis omitted).

[125] *Id.* at 20 (capitalization and emphasis omitted).

[126] Defendant also resurrects an old argument in an effort to have the Second Amended Complaint dismissed.  Defendant says that Plaintiffs' claims are derivative.  Defendant's point is that Plaintiffs are suing on behalf of the Trust for things that happened to companies that the Trust owns as a shareholder.  According to Defendant, this means that, in essence, Plaintiffs are shareholders suing on behalf of a company in which they own stock.  In such circumstances, Federal Rule of Civil Procedure 23.1's special pleading rules apply.  Plaintiffs have made no effort to comply with Rule 23.1 because they don't think this case falls within its scope.  The Court agrees (again) that compliance with Rule 23.1 is not required in these circumstances.  Mar. 18, 2022 Hr'g Tr., Vol. II (Doc. 108) at 30:1–15.

[127] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[128] *Iqbal*, 556 U.S. at 678.

[129] *Ashley v. U.S. Dep't of Interior*, 408 F.3d 997, 1000 (8th Cir. 2005).

But a court does not need to accept a plaintiff's conclusory statements or "'naked assertions' devoid of 'further factual enhancement.'"[130]

## I.      Breach of Trust

When Defendant stepped into the role of Trustee, he was granted broad powers and nearly unbridled discretion in the exercise of those powers.[131]   Nonetheless, his conduct is not entirely unchallengeable.   Under Arkansas law, "a court can interfere with the exercise of the trustee's discretion to prevent an abuse of that discretion."[132]   A trustee exercising his or her powers in a way that breaches the duty of loyalty, which requires a trustee to administer the trust in the interests of the beneficiaries, would be a prime example of an abuse of discretion.[133]   Thus, Plaintiffs can state a claim for breach of trust by plausibly alleging that Defendant "exercis[ed] or fail[ed] to exercise a power . . . because of spite or prejudice or to further some interest of his own or of a person other than the beneficiary . . . [or] that his motives were improper or that he could not have acted from a proper motive . . . ."[134]

Plaintiffs' breach-of-trust claim is premised on several different theories of liability.   Each theory is based on an alleged breach of the duty of loyalty.[135]   As Plaintiffs see it, Defendant took

---

[130] *Iqbal*, 556 U.S. at 678 (alteration adopted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[131] *See supra* notes 18–24 and accompanying text (discussing trustee's powers).

[132] *Clement v. Larkey*, 314 Ark. 489, 492, 863 S.W.2d 580, 581 (1993).

[133] *Id.* (equating abuse of discretion with breach of "the trustee's duty of loyalty and impartiality"); Ark. Code Ann. § 28-73-802(a); *id.* § 28-73-105(b)(2) (providing that the "terms of a trust" will not "prevail over . . . the duty of a trustee to act in good faith and in accordance with the purposes of the trust").   Failing to comply with the express terms of the trust is another, perhaps obvious, example of an abuse of discretion.  *See Hosey v. Burgess*, 319 Ark. 183, 191–92, 890 S.W.2d 262, 266–67 (1995) (stating that the trustee's "exceedingly broad" powers were "subject to the specific, overriding terms" of the trust itself and holding that the trustee's "fail[ure] to adhere to the . . . express directive" was a breach of the trustee's fiduciary duty).   So Plaintiffs could state a claim for breach of trust by plausibly alleging that Defendant violated the terms of the Trust itself.  That's a tall order, considering the high level of discretion granted to the Trustee.  Plaintiffs likely recognize as much, which explains why they don't spend any time going down this route.

[134] *Clement*, 314 Ark. at 493, 863 S.W.2d at 581–82 (quoting Restatement (Second) of Trusts § 187 cmt. g (1959)).

[135] Second Am. Compl. (Doc. 109) ¶¶ 101–04.

each of the challenged actions (or omissions) "with the purpose to benefit his own interests over those of the Trust, not caring whether his actions resulted in any benefit to the Trust . . . ."[136]  The Court considers each alleged breach in turn.

### A.     The Expiration of the 2014 Lease

Plaintiffs allege that Defendant "intentionally fail[ed] to renew (or attempt to renew)" the 2014 lease "with a purpose to benefit his personal interests over the interests of the beneficiaries."[137]  Plaintiffs lack standing to assert this theory of liability.  At the motion-to-dismiss stage, a plaintiff must allege facts that, taken as true, make it plausible to conclude that (1) the plaintiff suffered an injury-in-fact, (2) the injury was caused by the defendant's wrongdoing, and (3) the injury will likely be remedied by a favorable judicial decision.[138]

Plaintiffs try alleging an injury two different ways.  First, Plaintiffs focus on the fact that failing to renew the 2014 lease resulted in Helena Bridge and Helena Marine's leasehold becoming a month-to-month tenancy.[139]  This allegedly caused a "reduction in economic value to the Trust . . . ."[140]  Specifically, Plaintiffs allege that "it is nearly impossible for a lease for a term of years to have less economic value to a commercial lessee than a mere month-to-month tenancy would have

---

[136] Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 12.  The Second Amended Complaint's breach-of-trust claims do not trigger the probate exception to diversity jurisdiction.  That is because Plaintiffs do not argue that Defendant having a conflict of interest is a *per se* violation.  They can't make that argument without triggering the probate exception because the Will explicitly contemplates and allows such conflicts of interest.  Instead, Plaintiffs argue that Defendant acted with an improper motive (i.e., disregard for the Trust's interests, intent to subordinate the Trust's interests to Defendant's interests).  That argument doesn't trigger the probate exception because it doesn't seek invalidation of the Will.  *See Marshall v. Marshall*, 547 U.S. 293, 311–12 (2006).  Plaintiffs instead seek to enforce an unalterable legal duty that arose from Defendant's role as Trustee.  Accordingly, the Court has jurisdiction over the breach-of-trust claim.

[137] Second Am. Compl. (Doc. 109) ¶ 103(a)–(b).

[138] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element.") (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

[139] Second Am. Compl. (Doc. 109) ¶¶ 55–56, 103(a).

[140] *Id.* ¶ 103(a).

to the same lessee, where both leases burden the same property."[141]   That assertion is not enough

to meet their burden under *Ashcroft v. Iqbal* and *Bell Atlantic Corp. v. Twombly*.[142]   Plaintiffs' own

allegation acknowledges that the economic value between the 2014 lease and the month-to-month

tenancy could have been equal.   The Second Amended Complaint therefore merely speculates that

an economic injury may have occurred when the two companies became month-to-month tenants

after the expiration of the 2014 lease.[143]   Without factual allegations plausibly alleging that the

Trust actually suffered some kind of injury, Plaintiffs cannot proceed with this theory of

liability.[144]

Plaintiffs' alternate attempt to establish an injury is no more persuasive.   Under this novel

theory, Defendant's failure to renew the 2014 lease "depriv[ed] the Trust of economic value it had

. . . at least an opportunity to obtain . . . ."[145]   The Second Amended Complaint is unclear about

what economic value (or opportunities to obtain that undefined economic value) the Trust lost

because of the 2014 lease's expiration.[146]   This is a vague, general, and conclusory allegation.

---

[141] *Id.* ¶¶ 55–56 (emphasis omitted).

[142] *Iqbal*, 556 U.S. 662; *Twombly*, 550 U.S. 544.

[143] With respect to Helena Marine, Plaintiffs are in an even worse position because the alleged harm of having to settle for a month-to-month tenancy (instead of holding a lease for a term of years) is no longer occurring.   Solomon Farms and Helena Marine entered into a new five-year lease in February of 2021.   Second Am. Compl. (Doc. 109) ¶ 80; *see also* Ex. 11 (2021 Helena Marine Lease) to Second Am. Compl. (Doc. 109).   Thus, Plaintiffs would need to allege that some permanent injury resulted from the period of time in which Helena Marine was a month-to-month tenant. *See Spencer v. Kemna*, 523 U.S. 1, 7–8 (1998).   They haven't.

[144] *Spokeo*, 578 U.S. at 340 (stating that Article III standing requires an injury that "actually exist[s]"); *see also Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014) ("An alleged injury cannot be too speculative for Article III purposes. . . .   As the Supreme Court emphasized[,] . . . mere speculation that injury did or might occur cannot satisfy the requirement that an injury in fact must be fairly traceable to the alleged source.") (internal quotation marks and citations omitted).

[145] Second Am. Compl. (Doc. 109) ¶ 103(b).

[146] Plaintiffs may be referring to their allegation that Defendant wrongfully "retain[ed] ownership, through Solomon Farms" of the warehouse constructed by Helena Bridge and the office building constructed by Helena Marine.   *Id.* ¶ 103(f)–(g).   If that is the case, this theory of liability fails for the reasons provided *infra* note 165.

Plaintiffs also have a traceability issue.  Defendant argues that the Plaintiffs' lease-expiration theories rely on the mistaken "suggestion that the [two companies] had an absolute right to renew" the 2014 lease on the same terms as it was originally structured.[147]  In other words, Defendant is saying that Plaintiffs incorrectly presuppose that Defendant's alleged meddling was the *only* thing standing between the two companies and complete renewal of the 2014 lease. Defendant is right.

First, Helena Bridge and Helena Marine would have had to decide to exercise the right to renew.[148]  Plaintiffs implicitly speculate that Defendant's allegedly wrongful conduct was the sole reason the two companies did not exercise the right to renew the 2014 lease.  But there's no specific fact alleged to support that theory.[149]  Second, even if the companies exercised the right to renew, they would have had to negotiate a new rent price with Solomon Farms.[150]  If those negotiations proved unsuccessful, then the rent issue would have been subjected to binding arbitration.[151]  There is no way to know whether the negotiation-or-arbitration process would have resulted in a rent price that was as economically favorable to Helena Bridge and Helena Marine as the 2014 lease. So even if Plaintiffs sufficiently alleged an injury, they didn't plead facts that plausibly trace that injury back to Defendant's alleged misconduct.

---

[147] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111) at 13.

[148] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 8.

[149] Plaintiffs point to Helena Bridge's construction of the warehouse "in the years immediately prior to the Defendant's trusteeship" as evidence that Helena Bridge would have renewed the 2014 lease.  Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 15 n.7.  But Plaintiffs also say that Helena Marine built its new office building "after [its] leasehold rights had been converted to a month-to-month tenancy." *Id.*  The timing of construction is therefore hardly (if at all) meaningful as to whether Helena Bridge would have renewed the 2014 lease.

[150] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 8.

[151] *Id.*

B.        **Helena Bridge Asset Sale**

Plaintiffs make several allegations related to the 2019 Helena Bridge asset sale.  These allegations can be easily categorized into two different theories of liability.  Plaintiffs' first asset-sale theory is that the 2019 asset sale itself (i.e., the decision to go through with any such sale at all) was harmful to the Trust.  Plaintiffs' second asset-sale theory is that the manner in which Defendant conducted the sale (i.e., what was sold for value and, more importantly, what wasn't) was harmful to the Trust.  For both theories, Plaintiffs allege that Defendant "advis[ed], plann[ed], cooperat[ed] in, and approv[ed of]" the asset sale even though it "benefited his personal interests over the interest of the Trust and its beneficiaries."[152]

1.        **The Asset Sale Itself**

Plaintiffs allege that, as a result of the asset sale, Helena Bridge "ceased operations as [a] business entity."[153]  Plaintiffs also allege that "Helena Bridge was an operating business with approximately $980,000 of top-line revenue" the year before the asset sale.[154]  But Plaintiffs do not clearly allege why the asset sale itself was harmful to the Trust.

Reading between the lines, it appears that Plaintiffs are trying to say that (1) Helena Bridge continuing as a business entity was in the best interests of the Trust, and (2) Defendant allegedly knew this—but pursued the asset sale anyway—with the improper motive of "removing [Helena Bridge] as a going concern from the valuable [property] and installing Poinsett [Rice and Grain] as the new tenant."[155]  Plaintiffs don't have standing to pursue this theory of liability because they haven't plausibly alleged any harm to the Trust.  Specifically, they have not alleged facts from

---

[152] Second Am. Compl. (Doc. 109) ¶ 103(c).

[153] *Id.* ¶ 65(c).

[154] *Id.* ¶ 58.

[155] *Id.* ¶ 63 (footnote omitted).

which it is plausible to conclude that Helena Bridge continuing operations (as opposed to going through with the asset sale) would have resulted in more money in the Trust over time.

Plaintiffs' only allegation about Helena Bridge's viability as an operating business is that, at the time of the asset sale, it had approximately $980,000 in annual gross revenue.[156]  But gross revenue doesn't tell us anything about profit margin.  There is no allegation regarding profits.  (The Second Amended Complaint does show, however, that Helena Bridge was $31,000 behind on rent payments and owed approximately $570,000 to Helena Marine at the time of the asset sale.[157])  Moreover, there is nothing but speculation that Helena Bridge's $980,000 gross revenue would remain steady or grow.  There are no allegations as to whether the $980,000 annual revenue was part of a steady, increasing, or decreasing revenue trend.  So there's nothing to plausibly allege that the $1,900,000 asset sale harmed the Trust.[158]

Standing is not Plaintiffs' only problem.  Defendant argues that Plaintiffs' first asset-sale theory fails for the additional reason that Plaintiffs have not sufficiently alleged that Defendant acted with an improper motive.[159]  Plaintiffs do not directly counter this argument, but rather state (in their Response) that "[t]he Complaint is grounded on the assertion that when a trustee . . . has adverse personal interests, the trustee is required to favor the interests of the Trust . . . where there is an inescapable tension between the two . . . ."[160]  Essentially, Plaintiffs' argument is that the

---

[156] *Id.* ¶ 58.

[157] Ex. 8 (Helena Bridge Asset Sale Post Closing Summary) to Second Am. Compl. (Doc. 109) at 1.

[158] Plaintiffs' unstated, unquantified, and implicit revenue projection requires assuming that Helena Bridge would be able to continue operating on the leased land at the same price for the foreseeable future.  But Helena Bridge was merely a month-to-month tenant.  If a prospective renter willing to pay a higher price came along, Helena Bridge would had to have matched the new price or find a new place to set up shop.  Indeed, Plaintiffs essentially say this is exactly what happened.  But instead of trying to match the new price or find a new location, Helena Bridge chose to bring in $1,900,000 by selling most of its assets to the new tenant.  The Second Amended Complaint simply does not contain facts that plausibly allege this decision harmed the Trust.

[159] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111) at 18.

[160] Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 8 (emphasis omitted).

Second Amended Complaint plausibly alleges that Defendant pursued the asset sale with the impermissible purpose of installing a higher-paying tenant on the leased property.

Plaintiffs' argument is untenable.  Under their view of the law, Defendant had a legal obligation to continue leasing to Helena Bridge (month-to-month) even if the market would allow him to fetch a higher rate.  As an extreme example, if Helena Bridge could only afford to pay $1 per month in rent, while another would-be lessee was willing to pay $1,000 each month, Plaintiffs' position seems to be that Defendant would be duty-bound to lease the land for a dollar. Unsurprisingly, that does not reflect the state of the law.

In *Clement v. Larkey*, the Arkansas Supreme Court gave its blessing to a trustee's distribution of stock held in trust despite allegations that "the trustee's duty of loyalty and impartiality are violated . . . because the trustee proposes to benefit . . . herself."[161]  The Arkansas Supreme Court held that "[t]he fact of a coincidental benefit to a trustee is . . . not alone sufficient to establish an abuse of discretion on the part of the trustee; it is rather one factor to be considered in determining the question."[162]  Of course, the *Clement* Court acknowledged that it would have "interpose[d]" if the trustee had "exercis[ed] or fail[ed] to exercise a power . . . because of spite or prejudice or to further some interest of [her] own . . . ."[163]  And Plaintiffs' theory of liability is clearly that Defendant acted to further his own interest.  But the Second Amended Complaint contains no facts to support this theory other than the receipt of a benefit from the asset sale (i.e., a higher-paying tenant).  So Plaintiffs need their allegation that Defendant benefited from the asset

---

[161] 314 Ark. at 492, 863 S.W.2d at 581.

[162] *Id.*; *see also Hosey*, 319 Ark. at 191, 890 S.W.2d at 266.

[163] *Clement*, 314 Ark. at 493, 863 S.W.2d at 581 (quoting Restatement (Second) of Trusts § 187 cmt. g).

sale to function as a *de facto* allegation of an improper motive.  But Arkansas law is clear: Without something more, a benefit alone is insufficient.[164]

The Court notes that its conclusion may have been different had Plaintiffs plausibly alleged that the asset sale harmed the Trust.  That is because an injury to the Trust, combined with a benefit to Defendant, could make it plausible that Defendant's motive was to benefit himself without regard to the interests of the Trust.  But as it stands, the Second Amended Complaint does not plausibly allege that the Trust was harmed.  At most, it alleges that Defendant received a coincidental benefit as a result of a neutral transaction.  That simply is not enough to state a claim for breach of trust.[165]

---

[164] Plaintiffs say that their position is supported by the Arkansas Supreme Court's decision in *Hosey*.  Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 8–9 (quoting *Hosey*, 319 Ark. at 191, 890 S.W.2d at 266).  Yet *Hosey* expressly reaffirms *Clement*'s conclusion that an indirect benefit to a trustee is not enough on its own to state a claim for breach of trust.  *Hosey*, 319 Ark. at 191, 890 S.W.2d at 266 (citing *Clement*, 314 Ark. 489, 863 S.W.2d 580).  In *Hosey*, the benefit received by the conflicted, self-dealing trustee "was not merely coincidental but was, in fact, a breach of an explicitly defined duty" from the trust itself.  *Id.*  In the case at bar, the Second Amended Complaint does not allege that Defendant's actions (or intentional failures to act) with regard to the asset sale breached any specific provision of the Trust.

[165] This analysis applies equally to Plaintiffs' related suggestion that Defendant breached the duty of loyalty when, after the 2014 lease expired, he "retain[ed] ownership[,] through Solomon Farms," of the warehouse constructed by Helena Bridge and the office building constructed by Helena Marine.  Second Am. Compl. (Doc. 109) ¶ 103(f)–(g).  Plaintiffs' theory seems to be premised on the idea that the two companies (and therefore the Trust) lost their ownership interests in the two buildings.  But the 2014 lease itself shows—and Plaintiffs basically concede—that Helena Bridge and Helena Marine never enjoyed complete ownership of the two buildings.  Instead, the two companies' rights with respect to the two buildings were always limited by the terms of the 2014 lease.  Most importantly, it is clear from even Plaintiffs' reading of the 2014 lease that Solomon Farms would at some point take complete ownership of the two buildings unless the 2014 lease was perpetually renewed.  *See* Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 15 (stating that a "natural reading of" the 2014 lease leads to the conclusion that Helena Bridge and Helena Marine "owned the [buildings] as long as the" 2014 lease "was in effect . . .").  That means Plaintiffs are again essentially claiming that Defendant had a legal obligation to ensure that the 2014 lease never expired.  In addition to the problems previously identified with this position, the 2014 lease at most entitled Helena Bridge and Helena Marine to one three-year extension, not perpetual extensions.  *See* Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 8.

Plaintiffs lack factual allegations that, taken as true, could make it plausible to conclude that Defendant caused (or allowed) the 2014 lease to expire "because of spite or prejudice or to further some interest of his own or of a person other than the beneficiary . . . ."  *Clement*, 314 Ark. at 493, 863 S.W.2d at 581–82 (quoting Restatement (Second) of Trusts § 187 cmt. g).  The mere fact that Defendant benefited from the 2014 lease's expiration is not sufficient on its own.  But Plaintiffs allege nothing more than the benefit.  If Plaintiffs had plausibly alleged that the expiration of the 2014 lease impaired the two companies' operations by, for example, impeding access to the two buildings, then the Court may have ruled differently.  Instead, the Second Amended Complaint alleges that Helena Marine has remained

2.      **The Manner of the Asset Sale**

Plaintiffs' second asset-sale theory attacks the manner in which the asset sale was carried out.  Plaintiffs allege that Defendant "intentionally carr[ied] out the [asset sale] in a manner that did not seek to return compensation to the Trust for a portion of Helena Bridge's assets . . . ."[166] The specific assets to which Plaintiffs refer are Helena Bridge's (1) "leasehold rights," (2) "going concern value, also known as goodwill," and (3) the warehouse.[167]  Plaintiffs say that Defendant breached the duty of loyalty when he caused (or allowed) these assets to be "transferred out of the Trust . . . in exchange for nothing."[168]

a.      **Leasehold Rights**

The 2019 asset sale between Helena Bridge and Poinsett Rice and Grain was conditioned on Poinsett Rice and Grain securing a lease between itself and Solomon Farms for the property on which Helena Bridge (at that time) operated.[169]  Plaintiffs allege that Defendant "impos[ed]" this precondition to "intentionally expropriat[e] what remained of Helena Bridge's leasehold rights . . . ."[170]  In other words, Plaintiffs are saying that Defendant took something that should have been part of the asset sale (the remainder of Helena Bridge's lease) and instead sold it to Poinsett Rice and Grain himself.

The Second Amended Complaint assumes there was something for Defendant to take from Helena Bridge and sell to Poinsett Rice and Grain.  Assumptions don't cut it—Plaintiffs need facts.

---

on the land since the expiration of the 2014 lease, and Helena Bridge remained there until it ceased operations after the asset sale.

[166] Second Am. Compl. (Doc. 109) ¶ 103(e).

[167] *Id.* ¶ 65(a)(i)–(iii).

[168] *Id.* ¶ 103(e).

[169] Ex. 6 (Helena Bridge Asset Sale Agreement) to Second Am. Compl. (Doc. 109) at 8.

[170] Second Am. Compl. (Doc. 109) ¶ 103(d).

Specifically, Plaintiffs need factual allegations which, taken as true, make it plausible to conclude that Helena Bridge's rights as a month-to-month tenant were taken away (or otherwise impaired) by the lease between Solomon Farms and Poinsett Rice and Grain.  But there are no such facts alleged in the Second Amended Complaint.  There is no allegation, for example, that Helena Bridge's right to be on the leased land was cut short by Poinsett Rice and Grain's arrival as the new tenant.  Plaintiffs have failed to sufficiently allege any harm to the Trust.[171]

### b.    Goodwill

Goodwill is "another name for reputation, credit, honesty, fair name, [and] reliability."[172] Essentially, goodwill is an asset of a business that reflects the ability to expect continued patronage. Plaintiffs fault Defendant for not including Helena Bridge's goodwill in the asset sale.[173] Defendant counters that "goodwill is not recognized in asset acquisitions, but only in business

---

[171] Giving the Second Amended Complaint the most liberal and favorable reading possible, Plaintiffs could be trying to say that (1) the 2014 lease should have been renewed for an additional three-year term in 2017, which would mean that (2) Helena Bridge would have had time remaining on that additional three-year lease when Poinsett Rice and Grain replaced Helena Bridge as a tenant after the asset sale, so (3) the $1,900,000 Helena Bridge gained from the asset sale did not adequately compensate Helena Bridge because it did not account for the leasehold rights that (Plaintiffs believe) Helena Bridge should have had when the asset sale occurred.  To the extent Plaintiffs advance that theory, it stumbles right out of the gate.  The expiration of the 2014 lease and the 2019 asset sale are completely separate events; Plaintiffs have not alleged that the lease expiration and asset sale were part of some overarching scheme.  *See supra* note 56.  Additionally, this potential theory assumes that the 2014 lease should have been renewed. But, as discussed above, the Second Amended Complaint fails to plausibly allege that non-renewal of the 2014 lease was improper.  *See supra* Discussion Section I.A.  Moreover, Defendant could not sell something that did not exist at the time of the sale.  *Cf. infra* Discussion Section I.B.2.c.  So, even if the decision to let the 2014 lease expire was improper back in 2017, Defendant did not have a duty to include nonexistent leasehold rights in the 2019 asset sale. Finally, Plaintiffs still wouldn't state a claim even if they were right about the expiration of the lease being improper and Defendant having an obligation to include the hypothetical leasehold rights in the asset sale.  That's because Plaintiffs would simply be saying that the $1,900,000 sticker price for the asset sale was insufficient when compared to the "true" value of Helena Bridge's assets.  And, as discussed below, that approach fails too.  *See infra* note 183.

[172] *Goodwill*, *Black's Law Dictionary* (11th ed. 2019) (quoting Harry D. Nims, *The Law of Unfair Competition and Trade-Marks* 36 (1929)).  Plaintiffs use the terms "goodwill" and "going concern value" interchangeably.  Second Am. Compl. (Doc. 109) ¶ 65(a)(i).  Although it is common to conflate the two, goodwill and going-concern value are distinct assets.  Going-concern value refers to the efficiencies that result from buying an established business (e.g., a factory with all of the necessary machinery already installed).  *Goodwill*, *Black's Law Dictionary* (11th ed. 2019) (quoting 38 Am. Jur. 2d, *Good Will* § 2, at 913 (1968)).  It is clear from their briefing that Plaintiffs are referring to reputational goodwill in the Second Amended Complaint.  Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 16–18.

[173] Second Am. Compl. (Doc. 109) ¶¶ 61, 65(a)(i), 68–69, 103(e).

combinations (i.e., stock sales or mergers) . . . ."[174]  Because Plaintiffs do not allege a business combination, but instead allege an asset sale, Defendant says the Second Amended Complaint itself shows that "there was no goodwill to sell."[175]

The Court agrees that the allegations in the Second Amended Complaint come up short. Goodwill has value when the purchaser will obtain some benefit from the seller's reputation. Plaintiffs—by concluding that goodwill should have been included in the asset sale—are assuming that Helena Bridge's reputation would benefit Poinsett Rice and Grain.  But there are no facts alleged to support that assumption.   Indeed, a hypothetical posed by Plaintiffs actually demonstrates the Second Amended Complaint's deficiencies:

> Consider the sale of any small business, such as a restaurant.  The owner has operated the restaurant for 20 years at the same location, on leased land, and the new buyer will continue leasing.  Of course the building, the smallwares, the equipment, and furniture and the like, all have value.  But there is more, the patronage of the customers, the reputation of the restaurant—in short, the goodwill, which is intangible.  The buyer will buy the building, the smallwares, the furniture, and the equipment, of course.  But would any seller be satisfied to simply sell the hard assets, and receive nothing for the continued patronage he knows the restaurant will enjoy under the new owner, that his efforts built?[176]

Plaintiffs are likely correct that goodwill would be a valuable asset in this scenario.  But there are specific facts in Plaintiffs' hypothetical that are conspicuously absent from their Second Amended Complaint.

In the hypothetical, Plaintiffs explicitly state that the buyer of the restaurant's assets will continue operating the same type of business.  Not so for the Second Amended Complaint.  There is nothing to indicate that Poinsett Rice and Grain operated a business substantially similar to Helena Bridge's such that Poinsett Rice and Grain would be able to expect Helena Bridge's

---

[174] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111) at 16.

[175] *Id.*

[176] Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 17–18.

customers to become Poinsett Rice and Grain's customers.  Plaintiffs' hypothetical also strongly implies that the restaurant's buyer will keep operating under the seller's name.  But the Second Amended Complaint doesn't say (or even suggest) that Poinsett Rice and Grain was going to use Helena Bridge's name or any other similar trademarks.  The Second Amended Complaint simply has no factual allegations that make it plausible to conclude that goodwill should have been included in the asset sale.

### c.    Warehouse

Plaintiffs say that the warehouse constructed by Helena Bridge should have been part of the asset sale.[177]  Defendant says that the warehouse could not have been part of the asset sale because Helena Bridge "did not own the warehouse on the property; Solomon Farms did."[178]  Defendant is referring to the 2014 lease, which provided that "at the expiration of" the lease, Helena Bridge would "peaceably deliver to [Solomon Farms] the [leased] property and premises together with any addition or improvements thereto . . . ."[179]

According to Defendant, this provision means that the warehouse was "always part of the real estate owned by Solomon Farms."[180]  Plaintiffs counter that "[a] much more natural reading of" the 2014 lease leads to the conclusion that Helena Bridge "owned the [warehouse] as long as the" 2014 lease "was in effect . . . ."[181]  But the Second Amended Complaint alleges that the 2014 lease was no longer in effect when the asset sale occurred in 2019.[182]  So even under Plaintiffs'

---

[177] Second Am. Compl. (Doc. 109) ¶¶ 65(a)(iii), 103(e).

[178] Br. in Supp. of Def.'s Mot. to Dismiss (Doc. 111) at 17.

[179] Ex. 1 (2014 Lease) to Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111-1) ¶ 4.

[180] Def.'s Br. in Supp. of Mot. to Dismiss (Doc. 111) at 12.

[181] Pls.' Resp. to Def.'s Mot. to Dismiss (Doc. 113) at 15.

[182] The Second Amended Complaint alleges that the 2014 lease ceased to be in effect on September 14, 2017.  Second Am. Compl. (Doc. 109) ¶¶ 48, 50.  The asset sale took place on June 26, 2019.  *Id.* ¶ 61.

reading of the 2014 lease, the warehouse was owned by Solomon Farms, not Helena Bridge, at the time of the asset sale.  Thus, Plaintiffs have not plausibly alleged that the warehouse should have been included in the 2019 asset sale.[183]

## II.   Profit from Administration of Trust

In Count Two of the Second Amended Complaint, Plaintiffs say that Arkansas law "require[s] the Defendant to account for and restore to the Trust the amounts of his personal profit by reason of his administration of the Trust . . . ."[184]  Plaintiffs say this claim does not require a breach of trust, or even harm to the Trust.[185]  Instead, the mere (plausible) allegation of a profit is sufficient to survive a motion to dismiss.  Plaintiffs' claim is built on a faulty interpretation of Arkansas law.

Plaintiffs cite the Arkansas Trust Code for their profit-equals-liability theory.[186]  It is true that Arkansas Code Annotated § 28-73-1003(a) says a "trustee is accountable to an affected beneficiary for any profit made by the trustee arising from the administration of the trust, even

---

[183] Even if Plaintiffs were right (and they aren't) that the leasehold rights, goodwill, and warehouse should have been included in the asset sale, Plaintiffs' allegations still would not state a claim for breach of trust.  The essence of Plaintiffs' theory is that Defendant did not charge a high enough price for Helena Bridge's assets.  Plaintiffs say that "the overall true value of all of [Helena Bridge's] assets . . . was at least between $2,300,000 to $2,400,000, as a conservative estimate."  *Id.* ¶ 68.  (Aside from the general allegation that leasehold rights, goodwill, and buildings such as the warehouse are "asset categories common to all business[es]," Plaintiffs do not provide any facts supporting this "conservative estimate."  *Id.*)  Plaintiffs' theory could therefore be rephrased as alleging that Defendant committed a breach of trust because he only recouped 79% of the value of Helena Bridge's assets.  But there is no indication that Arkansas law considers this a breach of trust.  To the contrary, the Arkansas Supreme Court has previously found that a sale in which the trustee recouped only 66% of the property's value was "[c]learly" not a breach of trust.  *McCollum v. McCollum*, 328 Ark. 607, 611, 946 S.W.2d 181, 183 (1997).  In *McCollum*, the Arkansas Supreme Court applied the rationale of *Gregory v. Moose*, 266 Ark. 926, 590 S.W.2d 665 (Ark. Ct. App. 1979).  *Gregory* announced the rule that when a trustee "has discretion not only as to whether or not to sell the trust property but as to the mode and terms of the sale," a court will only step in if the price is "grossly inadequate, or unreasonably low, evidenced by bad faith, or so low as to shock the conscience of the court."  266 Ark. at 930, 590 S.W.2d at 668 (internal quotation marks and citations omitted).  In articulating this rule, the *Gregory* Court cited out-of-state cases upholding sales in which the trustee had recouped between 10% and 50% of the trust property's alleged value.  *Id.* at 932–33, 590 S.W.2d at 669–70.

[184] Second Am. Compl. (Doc. 109) at 21.

[185] *Id.* ¶ 105.

[186] *Id.*

absent a breach of trust."  But Plaintiffs neglect to acknowledge that § 1003(a) is merely a default

rule: The Trust Code explicitly prioritizes the "terms of a trust" over § 1003(a).[187]  And here, the

Trust clearly allows Defendant to profit.  Recall that the Trust authorizes Defendant to be on both

sides of transactions including "buying and selling" Trust assets, "lending and borrowing money,"

and "all other transactions . . . ."[188]  When someone sells something or loans money, they typically

do so for the purpose of turning a profit.  Plaintiffs' theory would essentially require the Court to

say this provision of the Trust only authorizes Defendant to sell something or loan money to the

Trust so long as Defendant breaks even or loses money.[189]  Arkansas law does not require such a

tortured reading of the Trust.[190]

---

[187] Ark. Code Ann. § 28-73-105(b).

[188] Ex. 1 (The Will) to Second Am. Compl. (Doc. 109), Item III, ¶ 16; *see also* Second Am. Compl. (Doc. 109) ¶ 26.

[189] *See* Mar. 18, 2022 Hr'g Tr. (Doc. 108) at 23–24 (Plaintiffs' counsel arguing that the Will "authorizes" Defendant to self-deal but "does not explicate him from the obligation to make the trust whole for any benefits to him").

[190] *E.g.*, *Bailey v. Delta Tr. & Bank*, 359 Ark. 424, 432, 198 S.W.3d 506, 513 (2004) (stating that courts must "construe the words and sentences used in a will or trust in their ordinary sense in order to arrive at the testator's true intention").  Plaintiffs also point to the Arkansas Supreme Court's decision in *Hosey* for support.  Second Am. Compl. (Doc. 109) ¶ 105 (citing *Hosey*, 319 Ark. at 191, 890 S.W.2d at 266).  There, the Arkansas Supreme Court used language nearly identical to § 1003(a) when discussing the contours of the duty of loyalty.  *Hosey*, 319 Ark. at 191, 890 S.W.2d at 266.  *Hosey* was decided in 1995—about ten years before the current Arkansas Trust Code, including § 1003(a), was enacted.  The Trust Code provides that "[t]he common law of trusts and principles of equity supplement [the Trust Code], except to the extent modified by [the Trust Code] or another statute of this state."  Ark. Code Ann. § 28-73-106.  Assuming for a moment that *Hosey* articulated the unalterable rule that Plaintiffs wish it did, the Trust Code overrides *Hosey* by allowing trusts to modify (or abandon entirely) § 1003(a)'s prohibition on trustee profiting.  But there is good reason to think that *Hosey* does not support Plaintiffs' profit-equals-liability theory in the first place.  The *Hosey* Court was quite clear that it was holding the trustee liable because of a profit that arose from a breach of the trust's provisions.  319 Ark. at 191–92, 890 S.W.2d at 266–67.  If the trustee's profiting was the only thing that mattered, then *Hosey* would have been a much shorter and simpler case.

Even if Arkansas law did not permit the Will to authorize Defendant's profiting, Count Two of the Second Amended Complaint would still be dismissed under the probate exception to diversity jurisdiction.  That is because Plaintiffs would necessarily be attacking the legality of the testamentary trust.  *Marshall*, 547 U.S. at 311 (stating that the "annulment of a will" is outside the scope of a federal court's jurisdiction).

## CONCLUSION

For the reasons given above, Defendant's Motion to Dismiss is GRANTED in its entirety.

Plaintiffs' Second Amended Complaint is DISMISSED without prejudice.

IT IS SO ORDERED this 4th day of November 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE